IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                         Cr. No. 18-457 JCH

LAWANDA MARY DODD-GOMEZ,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

    This case is before the Court on two motions by Defendant Lawanda Mary Dodd-Gomez: *Motion for Order Granting Specific Performance and Enforcement of Plea Resolution* [Doc. 59], and *Motion to Suppress Evidence* [Doc. 65]. Both motions are fully briefed with responses [Docs. 68, 69] and replies [Docs. 72, 73]. In addition, after the hearing on the motion to suppress, Defendant filed a written closing argument with additional evidence. [Doc. 78]. After reviewing the arguments made by counsel, the evidence, and the relevant legal precedents, the Court concludes that both motions should be denied.

**DISCUSSION**

## I.    MOTION FOR ORDER GRANTING SPECIFIC PERFORMANCE

    Defendant argues that she and the Government reached a plea agreement, but the Government refuses to honor it. She asks the Court to enforce that agreement by granting specific performance. The Government contends that it never made a definite offer and there was no

"meeting of the minds," and therefore no agreement to enforce. The Court agrees with the Government.

### A.   Legal Standard

The Tenth Circuit has held that the Court must interpret a plea agreement based on principles of contract law, looking to "the express language in the agreement." *United States v. Cudjoe*, 534 F.3d 1349, 1353 (10th Cir. 2008) (quoting *United States v. Rodriguez-Rivera*, 518 F.3d 1208, 1212-13 (10th Cir. 2008)). However, to enforce a plea agreement the Court must first determine whether an agreement has been reached.

New Mexico contract law requires that both parties to an agreement must arrive at a mutual understanding or have a meeting of the minds to form a valid contract. *Ratner v. MRC Partnership*, 1998 WL 567972 at *5 (10th Cir. 1998) (unpublished) (citing *Trujillo v. Glen Falls Ins. Co.*, 88 N.M. 279, 540 P.2d 209, 210 (1975)). The technical requirements for contract formation include an objective manifestation of mutual intent formed by a legal offer and acceptance of the material terms of the contract. *Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376, 961 P.2d 1283.

A contract can be express or implied. *See Orion Technical Res., LLC v. Los Alamos Nat'l Sec., LLC*, 2012-NMCA-097, ¶ 9, 287 P.3d 967. The New Mexico Court of Appeals stated that "[i]mplied-in-fact contracts are founded upon a meeting of minds, which, although not embodied in an express contract, is inferred from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Id.* (alteration, internal quotation marks, and citation omitted). "Our courts will . . . look to written representations, oral representations[, and] the conduct of the parties . . . to determine whether an implied-in-fact contract exists." *Id.* at ¶ 10 (alterations, internal quotation marks, and citation omitted). An implied-in-fact contract can be

created by the representations of a party when the representations create a reasonable expectation of contractual rights. *Id*.

However, in the context of settlement agreements where negotiations are ongoing and continuous, neither the offer nor the acceptance can be identified, and the moment of formation cannot be determined, the manifestation of mutual assent may not be as clear. *See* Restatement (Second) of Contracts, § 22(2) (1981) ("A manifestation of mutual assent may be made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined."). Under New Mexico law, a contract can be enforceable where acceptance was not unequivocal: "a party can be considered bound by a settlement even if certain details are not worked out, if such details are not essential to the proposal or cause a change in the terms or purpose to be accomplished by the settlement." *Jones v. United Minerals Corp.*, 1979-NMSC-103, ¶ 13, 93 N.M 706, 604 P.2d 1240.

The Supreme Court has identified two possible remedies for a breach of a plea agreement: (1) "specific performance of the agreement on the plea," or (2) "the opportunity to withdraw [the defendant's] plea of guilty." *Santobello v. New York*, 404 U.S. 257, 263 (1971).

**B.      Facts**

On February 14, 2019, the grand jury indicted Defendant for possession with intent to distribute phencyclidine. On April 11, 2019, Defendant's current counsel was appointed to represent her. [Doc. 42] That day, Defense counsel emailed counsel for the Government. Defense counsel asked what plea offer the government had made through Defendant's prior lawyer. The Government responded, "We were offering the possibility of a B-level offense. The sticking point was we wanted her to debrief and provide access to her phone before formally extending the offer. . . I can't say for sure the deal is still there but I will push hard for it if she changes her mind about

the debrief." Defense counsel responded with a question: "Do you think she is safety valve eligible? If so, would your B level plea also include a 2 level minor role adjustment if she does a debrief? Is the proposed plea a C1c or just non binding [sic] recommendations?" There was no response from the Government.

The parties discussed a plea again on July 15, 2019, when defense counsel emailed the Government regarding discovery issues and extending the motion deadline. In that message, defense counsel stated, "I am trying to flesh out some issues that I believe may leverage a better plea from you and your office. We already discussed some of the issues with the case when we met in person, and I think you appreciate some of the concerns with your request for her to give a debrief in order to possibly get a B level plea." On July 18, 2019, counsel for the government responded, mentioning the possibility of a state diversion program for the first time:

> "[M]y office is trying to start a state diverson [sic] program. I think Ms. Dodd-Gomez might be a good case to try as one of the first ones. The specifics of the plea deal and the mechanics of making it happen are still being worked out, but I am told we should have a better idea in the next few weeks. The general look of the deal will likely be an agreement to plead to 3 years in the state (but it will only be a 50% crime). Would you like me to push for Ms. Dodd-Gomez as a candidate for the program?"

Defense counsel responded, "What a great idea for a program! So she would plea and be sentenced in state court and the federal case dismissed? Yes, I can say she would agree to that. Keep me posted on next steps." The next day, July 19, counsel for the government wrote, "I will keep you updated—no reason to keep this case around longer than we need to." Defense counsel quickly responded, "Wow, that's so great! Thank you for offering it. I will file a motion to continue today and await word from you on next steps."

On July 20, 2019, defense counsel filed a motion to continue the trial in the case. [Doc. 50]. The motion says "[t]he parties are close to a final resolution," that the Defendant "is a good candidate for a new state diversion program," and that "the government has agreed to consider her for this program." It further states that the Government does not oppose the motion.

On July 30, 2019, defense counsel emailed the government "to check in about the status of the state diversion program on this case." Government counsel responded, "things are good but slow. It looks like all parties are on board but they are still working on the logistics of how it will actually happen (particularly who is paying for what). My boss has been on vacation for a week and does not get back until next week, but I did identify Ms. Dodd-Gomez as a good candidate for the program. I will let you know if I get any updates between now and then." The next day, July 31, defense counsel asked, "Will all this time [that defendant has spent in custody] count toward her state sentence of 3 years? Or will she be expected to start all over on the 3 year sentence?" On August 2, 2019, the government responded,

> "So, we don't have an answer to that right now because the intent for these is to do them all pre-indictment. I would imagine, and what I recommended, is to give credit for time served in fed custody. I was told we are just finalizing the standard paperwork we will use with the States. Once that is finished I think we'll be able to get moving."

On August 22, 2019, counsel for the government wrote to defense counsel again, stating, "Progress is being made with sending cases to the state. As proof, I got an answer to your question below: yes, time served in federal custody will count towards the state sentence." The following day defense counsel responded, "I told [Defendant] we are just waiting on paperwork. She may be time served eligible if all this time counts for state time at a 50 percent good time rate." There is no

evidence that the Government agreed or even responded to defense counsel's statement regarding good time.

The next written communication between the parties was on August 26, 2019, when defense counsel asked the government for any updates to support a motion to continue trial, including "maybe even a draft plea agreement." The following day, counsel for the government responded, "The status of the program is we are waiting on a state court judge to approve the paperwork we will use. I think best case scenario is we hear back in October."

On September 3, 2019, Defendant filed another motion to continue trial. [Doc. 52]. In that motion, Defendant stated:

> "As articulated in the last motion to continue, the parties were close to a final resolution that is significantly more favorable to Ms. Dodd-Gomez than previously anticipated. Specifically, it appears Ms. Dodd-Gomez is a good candidate for a new state diversion program that the United States Attorney's Office is starting. . . . The government has also represented that Ms. Dodd-Gomez does qualify for the state diversion program. The mechanics of the program are that her federal case would be dismissed, and she would be charged, plead and sentenced in state court with these drug crimes, which the term of incarceration would be approximately 3 years. However, she would receive credit for her time already served in custody, and be eligible for good time reduction on her incarceration of 50 percent instead of the 85 percent in the federal system. The government has reported that they are just waiting on the final paperwork and that Ms. Dodd-Gomez may be close to a time served sentence.

[Doc. 52 at 1-2]. The motion goes on to say that Defendant waives her speedy trial rights "to allow the government to finalize the mechanics of this new program," and that the proposed continuance "could result in a resolution with the government that substantially benefits her." [Doc. 52 at 2]. The motion states that Government counsel does not oppose the motion, but it does not state whether he had been shown a copy of it prior to its filing. Counsel for the Government is not a signatory on the motion.

The following day, September 4, 2019, counsel for the government wrote, in pertinent part:

> We finally have the state program up and running. We are scheduled to do the first cases on September 27. The offer will be for 3 years (which with the state breaks down to about 18 months, not including credit for time in federal custody). However, in order for your client to be eligible she will need to debrief and provide access to her phone."

Nine days later, on September 13, 2019, counsel for the Defendant responded. She asserted that "we already accepted the offer you originally extended. This appears to be a new offer whereby you are demanding her phone and debrief, which is not a term of the first offer." The Government counsel replied that he "disagreed with most of your representations and interpretations of our conversations [] in your email." In subsequent emails on September 16, counsel for the defense asserted that a deal had been reached and that the Government was changing the terms. The prosecutor did not discuss the issue but stated that the next step in the plea deal would be setting up a debrief: "If [defendant] is not interested in the deal with these terms, then please let me know." Defense counsel again insisted that the Government was making new demands, asked for the identity of the prosecutor's supervisor, and requested that he produce documentation proving that a debrief was a requirement for participation in the diversion program. At the end, she asked the Government's position on another motion to continue. Government counsel responded simply, "The Government does not oppose."

On September 17, Defendant filed a third motion to continue. [Doc. 54]. In that motion, Defendant states that "the government extended and Ms. Dodd-Gomez accepted a resolution in this matter for her to participate in a new state diversion program." The motion does not inform the Court that the Government denied the existence of a plea deal, even though counsel had discussed that fact via email the previous day. It does say that the prosecutor does not oppose the motion to continue, which was true as far as it went. The Government did not file a response to

the motion to continue. The record contains no evidence as to whether counsel for the Government

had an opportunity to review it before it was filed.

This motion to grant specific performance followed.

### C.    Analysis

As a result of the foregoing, Defendant contends that she and the Government had reached

an enforceable plea agreement which entailed her participation in the state diversion program and

a sentence of three years, with time served in federal custody to count toward her state sentence

for violation of NMSA 1978, § 30-21-33 with a "meritorious 'good time' reduction of

approximately 50 percent. [Doc. 59 at 1]. She contends that by requiring her to debrief and provide

access to her phone as a condition of her participation in the program, the Government is

attempting to unilaterally change the terms of the deal. However, for several reasons the Court

concludes that the parties never reached an enforceable agreement.

First, the Government never made Defendant a firm offer for a plea. On July 18, 2019, the

Government mentioned the state diversion program for the first time, but the language was far

from definite. The prosecutor described "the general look of the program," stated that defendant

"might" be a good candidate, and expressly stated that there were no definite terms by noting that

"[t]he specifics of the plea deal and the mechanics of making it happen are still being worked out."

According to Defendant [Doc. 73 at ¶ 9], the Government's firm offer came on July 30,

2019, after an inquiry from the defense, when Government counsel responded, "It looks like all

parties are on board . . ." However, Defendant ignores the rest of the message. The prosecutor also

stated that his boss was out of town and would not return until the following week, which clearly

suggested that no agreement could be reached in that person's absence. Further demonstrating that

there was no firm offer on the table was that the Government stated that "they are still working on

the logistics," but that counsel had identified Defendant as a good *candidate* for the state diversion program. The word candidate suggests that there was no certainty that Defendant would be chosen and approved for the program, only the potential that she might be.

When defense counsel asked whether time served in federal custody could count toward her client's state sentence, the Government again was non-committal. As written, the Government's response seems to be a general one that is not specific to Defendant's case. The prosecutor says he does not have an answer to defense counsel's question but mentions the "intent" of the program was to "do them all pre-indictment." The Government continued with language that was far from certain, stating that he would "imagine," and had "recommended," that in the diversion program federal time would count towards a state sentence. This language still does not convey a definite offer. He also indicated that the diversion program was not yet running because paperwork still needed to be finalized between the Government and the state. The next communication from the Government a few weeks later continued to be indefinite, stating that progress was being made in sending cases to the state. It does not state that Defendant would be accepted into the nascent diversion program or set forth any particular terms of her proposed plea, save that Defendant's time served in federal custody would count towards the state sentence.

The fact that the parties had not reached a firm plea deal is evident in their next exchange, when defense counsel asked the government for any updates to support a motion to continue trial, including "maybe even a draft plea agreement." In asking for a written draft of a plea agreement, it appears that defense counsel was attempting to get the Government to make a firm offer. But no firm offer was forthcoming. Rather, the Government's response indicates—once again—that the state diversion program was not yet finalized because the state court had not yet approved it. The prosecutor indicated that it could be two months before they heard back from the state. The defense

9

could not reasonably believe they could rely on a state court diversion program that had not yet come to fruition.

This was the state of affairs on September 4, 2019, when the prosecutor informed defense counsel that the state diversion program was now finally "up and running." There is a marked change in the tone and content of the Government's email at this point. The prosecutor uses much more definite language in discussing a possible plea, including the length of the proposed sentence. He also states that Defendant's eligibility for the program depends on her willingness to debrief and provide access to her phone. Although Defendant claims that this added a new term to an already firm plea bargain, the Court concludes that it is the attempt to begin serious negotiations after a series of indefinite exchanges about Defendant's possible participation in an inchoate state diversion program. Because there was no definite plea offer by the Government before this point, the Court cannot conclude that the parties had an enforceable agreement.

Second, even if the Government had made an offer, the record contains no evidence that the putative agreement contained all essential terms. The state diversion program purportedly would allow Defendant to plead guilty in state court to a violation of New Mexico state law. However, nothing in the communications between counsel suggests exactly what state law Defendant was going to plead guilty to violating—an essential term in any plea. The indictment in this federal case charges her with possession with intent to distribute 1 kg and more of a mixture containing phencyclidine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). But the parties never discussed what state law the defendant would agree to plea to.

In her reply brief, Defendant suggests that there was only one possible state statute that she could have pled guilty to, NMSA 1978, 30-21-33. That may or may not be true, but a Court asked to enforce a plea agreement cannot be expected to canvass state statutes to determine whether a

particular provision is the most logical or even the only one to apply to a plea agreement when the parties have not even discussed, much less agreed, to that material term. A plea agreement cannot go forward without a mutual understanding of what crime the defendant will plead guilty to committing. Material terms are ones that are integral to the contract's enforcement. *Onewest Bank, FSB v. Farrar*, Case No. 12-00108 ACK-KSC, 2013 WL 6175321, at *10 (D. Haw. Nov. 19, 2013). "Material terms to the plea agreement can be established by what is necessary for a plea agreement to be accepted by a judge." *United States v. Mower*, 110 F. Supp. 3d 1196, 1200 (D. Utah 2015). Here, Defendant argues that Defendant cites no authority that suggests that a Court may find the existence of an enforceable plea agreement by inferring the existence of a material term—one that the parties have neither discussed nor agreed to—based solely on what seems logical to the Court.

Third, Defendant attempts to either create an enforceable plea agreement from the unopposed motions to continue she filed in the case without objection by the Government, or to use them as evidence that an agreement was in place. However, the unopposed motions cannot create a meeting of the minds where none previously existed. According to the Defendant, the Government's firm offer and her acceptance took place on July 30, 2019. She contends that her September 3, 2019, motion to continue provides evidence that they had reached a resolution of the case because it sets forth Defendant's understanding of the terms of the plea she wished to enter. However, the Court notes that several elements are missing. First, it does not state what state crime Defendant would plead guilty to committing. Second, there is no evidence that the Government approved the language of the motion, including the description of the purported settlement, before it was filed. Indeed, the record contains no evidence that the federal prosecutor even saw the motion before it was filed, much less concurred in its language. The evidence shows only that the

11

Government informed defense counsel that it did not oppose the continuance. The fact that Defendant put her own interpretation of the negotiations in the body of the motion and then stated that the Government did not oppose a trial continuance does not bind the Government to her recitation of settlement terms.

Nor does Defendant's September 17, 2019 motion to continue aid her cause. Over the previous four days counsel had a rather contentious email exchange with the Government, who denied that the parties had reached an agreement. Defendant's motion did not inform the Court of that dispute. Instead, Defendant represented to the Court that "the government extended and Ms. Dodd-Gomez accepted a resolution in this matter for her to participate in a new state diversion program." Again, there is evidence that the prosecutor agreed to a continuance, but no evidence that he ever saw or approved the language of the motion before it was filed.

Fourth, Defendant cannot show detrimental reliance. As previously discussed, there was no plea offer extended by the government upon which Defendant could reasonably have relied. There was discussion of a possible plea under a state diversion program that had not yet been formalized, but there was no firm offer extended. Any reliance by Defendant based on these discussions was not reasonable, and Defendant cannot use unreasonable reliance to enforce an agreement that was never reached.  Further, to prove detrimental reliance a defendant must show that the misrepresentation prejudiced him in that "the error was likely to have altered [his] decision to plead guilty." *United States v. Coon*, 805 F.2d 822, 825 (8th Cir. 1986) (quoting *United States v. Fuller*, 769 F.2d 1095, 1098 (5th Cir. 1985)). In *Coon*, the defendant asserted that he detrimentally relied upon the prosecution's plea agreement by fully cooperating with the government and pleading guilty to a single count of conspiracy to distribute cocaine. *Id*. at 824. The plea agreement mistakenly proposed a maximum fine of $25,000. for the offense when the

actual maximum fine had increased to $250,000. However, the defendant was informed of the mistake prior to the entry of his guilty plea. The defendant argued that after he met with a special federal agent investigating the case and told him everything he knew, he had changed his position in reliance on the proposed plea agreement and could not be restored to the status quo ante by pleading not guilty and proceeding to trial upon learning of the fine increase. *Id*. at 824-825. The court rejected these contentions and held that only the actual entry of an involuntary guilty plea can be considered detrimental reliance. *Id*. Here, Defendant has set forth no authority which holds that waiver of one's speedy trial rights constitutes detrimental reliance.

Accordingly, the motion for specific performance will be denied.

## II.      MOTION TO SUPPRESS

On January 27, 2018, Defendant had an encounter with law enforcement on an Amtrak train while it was stopped in Albuquerque, New Mexico. That encounter ended with a pat down of Defendant's person, the discovery of hard bundles concealed under her clothes, her arrest, and her transport to the local DEA office. There, a further search revealed the presence of four plastic bottles containing a brown liquid underneath her clothing.  After law enforcement officers removed the bottles, they discovered that they contained illegal narcotics. In her motion to suppress, Defendant first argues that the encounter on the train was not consensual but rather was an illegal seizure. Second, she argues that she did not give valid consent to search her person. Third, she argues that the DEA agent lacked probable cause to arrest her at the train station.

On October 13, 2020, the Court held a hearing on the motion to suppress. As a result of the COVID-19 pandemic, the Court conducted the hearing via videoconference. Defendant attended and was represented by counsel. The Government presented the testimony of the Drug

Enforcement Agency ("DEA") agent who arrested Defendant, and Defendant testified on her own behalf. Among the exhibits were a belt tape recording of the encounter, as well as photographs of the Defendant.

###    A.    Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures." U.S. Const. amend. IV. Before assessing whether the actions of law enforcement constituted an unreasonable seizure, we first ask whether a seizure occurred. There are three types of police-citizen encounters: (1) a consensual encounter, which does not constitute a seizure and therefore does not implicate the Fourth Amendment; (2) an investigative detention, which must be justified by reasonable suspicion of criminal activity; and (3) an arrest, which must be justified by probable cause. *See United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017); *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

"The Fourth Amendment does not proscribe all contact between the police and citizens." *INS v. Delgado*, 466 U.S. 210, 215 (1984). For instance, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)). These are referred to as consensual encounters which do not implicate the Fourth Amendment. *See United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006). It is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

In determining whether an encounter between a police officer and a citizen is consensual, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). "[T]he test allows officers to make inquiries so long as they don't throw their official weight around unduly." *United States v. Tavolacci*, 895 F.2d 1423, 1425 (D.C. Cir. 1990). This inquiry is objective: "As long as a reasonable innocent person, as opposed to a person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." *United States v. Laboy*, 979 F.2d 795, 799 (10th Cir. 1992). There are no *per se* rules that govern this inquiry; "[r]ather, every case turns on the totality of the circumstances presented." *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999) (quoting *United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc)). However, it must be said that when an encounter with police occurs on a bus or train, the relevant inquiry is not whether a reasonable passenger would feel free to leave the bus or train, but rather, whether a "reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436.

The Tenth Circuit has enumerated a list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police. Although the list is not exhaustive, it includes:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether

or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Lopez*, 443 F.3d at 1284 (quoting *United States v. Spence*, 397 F.3d 1280, 1283 (10th Cir. 2005)). While "no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Lopez*, 443 F.3d at 1284-85 (quoting *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006)).

As noted herein, the Fourth Amendment prohibits warrantless searches. However, certain exceptions exist. "Voluntary consent to search is one such exception." *United States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (quotation omitted). "The government bears the burden of showing the consent was voluntary by (1) proffering clear and positive testimony that consent was unequivocal and specific and freely given and (2) proving that this consent was given without implied or express duress or coercion." *United States v. Salas*, 756 F.3d 1196, 1203 (10th Cir. 2014) (quotation omitted). Consent may be either express or implied. *Jones*, 701 F.3d at 1317.

In determining whether consent was freely given, "some of the relevant considerations include":

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the [person who gave consent], the number of officers on the scene, and the display of police weapons. Whether an officer ... obtains consent pursuant to a claim of lawful authority, or informs [someone] of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*Id.* at 1318 (quotation omitted).

Finally, an arrest must be supported by probable cause, which is a more demanding standard than the reasonable suspicion required to support an investigative stop. *See United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). "A court will find probable cause to arrest when

facts and circumstances from a reasonably trustworthy source are within the officer's knowledge and sufficiently warrant a person of reasonable caution to believe a crime has been or is being committed by the person to be arrested." *United States v. Pearson*, 203 F.3d 1243, 1268 (10th Cir. 2000). Probable cause is an objective standard. "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Thus, the primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *See United States v. Valenzuela*, 365 F.3d 892, 896-97 (10th Cir. 2004) (citations and internal quotations omitted). No single factor is determinative, and the circumstances must be viewed in their totality. *See id*. at 897. In determining whether probable cause to arrest existed, the Court must look not only to the facts supporting probable cause, but also to those that weigh against it. *See id*. The Government bears the burden of establishing the probable cause necessary to support the arrest. *See id.* at 902.

### B.    Factual Findings

Jarrell Perry is a special agent with the DEA who specializes in drug interdiction work in Albuquerque. On January 27, 2018, he was alone doing interdiction work at the Albuquerque Amtrak train station.  He was wearing plain clothes—jeans and a zipped hoodie over a long-sleeved shirt. Perry was carrying a firearm concealed underneath his shirt and jacket. There is no evidence that Defendant was aware that he had a weapon. He also wore a digital recorder around his neck that was concealed under his shirt.

Perry approached Defendant while she was in a second-floor window seat on the left side of the train. He stood across the aisle and just behind her seat. Perry saw that Defendant was wearing an unzipped black jacket over a black hoodie. As he started speaking with her, Perry could see that she had two large bulges under her shirt near her waist on each side of her body. The

17

photographs admitted into evidence at the hearing illustrate that the bulges under her clothes were visible to a casual observer. The bulges were consistent with similar bulges that Perry had seen on passengers who were concealing narcotics.

Agent Perry said hello to Defendant, asked her how she was doing, said he was a police officer, and showed her his DEA badge. He asked Defendant if he could speak to her, and she said yes. Perry then asked Defendant if she had her ticket with her, and she said that she did, and she handed the ticket to him. He looked at it and then returned it to her. Perry asked her where she was headed, and Defendant responded, "Cleveland, Ohio." In response to questions from Perry, Defendant indicated that she was traveling alone from Los Angeles, where she lived, to visit her sick aunt in Cleveland. Perry handed Defendant's ticket back to her and asked how long she planned to be in Cleveland. Defendant responded, "Two weeks." Perry then asked Defendant if she had ID. She responded in the affirmative and handed him her ID card. Looking at the ID, Perry verbally confirmed Defendant's birthdate. After reviewing the ID, Perry returned it to Defendant. Continuing to make conversation, Perry asked Defendant if she knew what the weather was going to be like in Cleveland, how long her aunt had been sick, and whether she had other family in Cleveland. At this point, Perry had been talking with Defendant for approximately one and a half minutes.

At this point, Perry told Defendant that he talked to as many people on the train as he could due to the lack of security on Amtrak and the fact that "sometimes we got a problem with people carrying contraband on the train," including weapons and illegal narcotics. Perry then asked Defendant if she had luggage with her. She told him that she had one bag downstairs, but no luggage with her at her seat. He asked her if her name was on her bag, and she said, "No." Then Perry asked, "Would you be able to show me your luggage that you have downstairs? 'Cause

Amtrak likes to make sure everybody has a name on their bag." In response, Defendant twice said "yes," once during the question and again at the end. Perry repeated, "Can you, would you come to show me your bag down there?" Again, Defendant responded, "Yes." Defendant put her shoes on and then walked down the stairs to the luggage compartment on the first floor, Perry following behind. On the way, he asked her what part of California she was from and how she liked the train. At this point, they had been speaking for approximately three minutes.

Downstairs, Defendant identified her bag and confirmed it was her only one. Perry asked, "And no weapons or anything illegal?" Defendant responded, "Nuh-uh." From her tone of voice, the Court interprets this as a negative response. Then Perry said, "Would you consent for a search of your bag for contraband?" Defendant said, "Go ahead," and Perry searched the bag. While he searched, Perry made small talk about the weather but found no contraband inside. Then, Perry asked, "Do you consent for a search of your purse too?" and Defendant responded, "Yes." After pausing to let some other passengers walk by, Perry searched Defendant's purse but found no contraband. When Perry concluded the search of Defendant's bag and returned it to where he found it, the interaction had lasted approximately four and a half minutes.

Then he said to the Defendant, who was standing, "Ma'am, and I notice you got a big shirt on, you don't have anything underneath your shirt, do you?" Defendant responded, "No, I don't." Perry did not believe her because he could see the bulges under her clothing, so he said, "Give me permission just to pat you down for contraband?" and Defendant responded, "Yes." Perry conducted a pat down and felt large, hard bulges under Defendant's shirt. In the past, Perry has seen hundreds of passengers with bundles containing illegal narcotics hidden under their clothing. Believing he had probable cause, Perry then arrested Defendant and placed her in handcuffs, approximately five minutes after their encounter had begun.

19

Perry then called for backup, and Defendant was transported to the local DEA office. When he searched Defendant at the train station, Perry did not lift Defendant's shirt or place his hands under her clothing. At all times during their encounter on the train, Perry's tone of voice remained calm and non-threatening. At the station, agents performed a search of Defendant and discovered that the bulges under her clothing consisted of a total of four large bottles wrapped up into three packages. They contained a brown liquid that testing confirmed to be phencyclidine.

### C.      Analysis

#### 1.      <u>Consensual Encounter or Unlawful Seizure</u>?

Defendant argues that her encounter with Agent Perry escalated into an unlawful seizure when he asked her about bulges under her shirt and then asked for consent to perform a pat down. However, in reviewing the totality of the circumstances from the point of view of an objectively reasonable person, the Court concludes that until Defendant was placed under arrest, this was a consensual encounter.

The Court begins with the non-exhaustive list of factors enumerated by the Tenth Circuit. Most of these factors weigh in favor of finding the encounter to be consensual. First, the interaction took place in the presence of people on a crowded public train who were able to see and hear both Perry and Defendant. As a result, Perry would not have been able to hide the use of force or any other coercive tactics. Second, Perry did not restrain Defendant until the time of her arrest at the end of the encounter. By standing behind and across the aisle from where Defendant was seated, he did not block her egress from her seat or her ability to walk away from him. In addition, Perry did not touch Defendant at any time until after she consented to a pat down. Although Defendant testified that Perry touched her on both sides of her body and felt the bulges under her clothing before she consented to a pat down, based on the audio recording the Court finds Perry's testimony

more credible on this point, as discussed in further detail below. Third, Perry wore plain clothing, not a law enforcement uniform. Fourth, although he wore a firearm, it was hidden under his clothes. Defendant does not claim that she could see it or that she knew he had it. Fifth, Perry was the sole law enforcement officer on the train; after her arrested Perry, he had to call for backup. The audiotape of the encounter shows his demeanor and tone of voice were calm and even, not angry, forceful, or intimidating. Sixth, while Perry asked to see Defendant's ticket and identification, he testified that he returned them to her immediately after reviewing them. Nothing in the recording contradicts his testimony, and Defendant does not assert that he retained any of her personal effects for any significant length of time. Seventh, the duration of the encounter was five minutes—not an unreasonably long time given his neutral tone, lack of uniform or displayed weapon, and the public setting.

Only one factor does weigh against a conclusion that the encounter was consensual, and that is that Perry did not specifically advise Defendant at any time that she had the right to terminate the encounter or to refuse consent.

In her testimony, Defendant testified that she felt nervous and scared when Perry was asking her questions. She also testified that Perry was "terrorizing" her by continuing to talk to her and that his tone was "demanding." The evidence does not support this assertion. The audio recording of the encounter reveals that Perry's tone was even and even friendly at some points. In addition, Defendant never told Perry to stop speaking to her, and she never told him that she did not want to answer his questions. As previously discussed, there is no evidence that Perry displayed his weapon, used an aggressive tone of voice, made threats, or tried to impose his will on Defendant—he asked for permission to speak with her, and that is what he did. The Supreme Court has held that law enforcement officers do not violate the Fourth Amendment by merely

21

approaching an individual in public and asking her if she is willing to answer some questions. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Here, Perry talked to Defendant for five minutes before he arrested her. While that is more than a cursory interaction, it is not an unreasonably long period of time, and considering that it was done in public and without any coercive techniques, it does not weigh in favor of turning the encounter into a seizure.

Defendant also argues that she felt subjectively afraid and intimidated by Perry because of past abuse that she has suffered. However, Defendant's subjective emotions—whether they stem from her past abuse or even from fear stemming from the knowledge that she was carrying something illegal—are immaterial. The standard is an objective one, taken from the point of view of a reasonable innocent person. If such a person would feel free to leave, such encounters are consensual. *United States v. Laboy*, 979 F.2d 795, 799 (10th Cir. 1992). Thus, the Court cannot consider Defendant's subjective fears under the *Florida v. Bostick* totality of the circumstances standard.

After considering all the foregoing, the Court concludes that under the circumstances of this case, a reasonable innocent person would have felt free to leave or to end the conversation, and therefore this was a consensual encounter.

### 2.      Validity of Consent to Pat Down

At the hearing, Defendant testified that Perry patted her down and felt the bundles under her clothes before he asked for her consent. Conversely, Perry testified that he asked for and received Defendant's consent to the pat down before he touched her or the bulges under her clothes. Their testimony is in opposition; there is no way to reconcile the two. However, it is the Government that bears the burden to show that consent was voluntary before the search.

The Court finds that the Government has met its burden and that Agent Perry's testimony on this point is more credible. In reaching this conclusion, the Court relies primarily on the recording of the encounter. In that recording, the following exchange is brisk, with no pauses. Perry says to Defendant, "Ma'am, and I notice you got a big shirt on, you don't have anything underneath your shirt, do you?" She responds immediately, "No, I don't." Without pause, Perry then asks, "Give me permission just to pat you down for contraband?", and she promptly responds, "Yes." At this point in the recording there is a pause for four to five seconds where no one speaks, and then Perry asks Defendant to set her purse down and proceeds to place her in handcuffs. Both the pacing and the content of this conversation suggest that Perry searched Defendant during the pause after she said "yes" to his request to perform a pat down. Otherwise, one would have to believe not only that Perry was patting down Defendant *while* he was asking about her shirt and asking her for permission to search, but also that Defendant allowed him to do this silently. She does not object to him touching her, and when he asks her for permission to pat her down, she does not say something along the lines of, "You already did." Simply stated, nothing about the conversation suggests that events transpired in the way that Defendant suggests.

Having concluded that Perry did ask for and was granted consent before he conducted the pat down, the Court next must determine whether Defendant gave him her consent voluntarily. The Court answers this question in the affirmative. First, there is no evidence that Defendant endured any physical mistreatment or violence at Perry's hands. Second, Perry did not use threats, promises, or inducements to get Defendant to grant consent. Nor is there any evidence that Perry used deception or trickery. Rather, the audiotape of the encounter demonstrates that he asked Defendant straightforward questions. Third, the audio recording reveals that Perry did not use an aggressive tone. Fourth, there is no evidence that Defendant's physical or mental condition

23

rendered her unable to understand what was happening. Fifth, Perry was the sole officer on the scene, and he did not display weapons, so Defendant was not overcome by an overwhelming show of police power. All these factors weigh in favor of finding consent to be voluntary. Just as in the preceding discussion regarding consensual encounters, the sole factor that tilts in favor of finding coercion is that Perry did not inform Defendant of her right to refuse consent to search. However, this fact is far outweighed by all the other facts enumerated in this paragraph that support a finding of valid consent. Accordingly, the Court concludes that under the totality of the circumstances, Defendant voluntarily granted Perry consent to conduct the pat down.

### 3.      Probable Cause to Arrest

Defendant's final argument is that after he conducted the pat down, Perry lacked probable cause to arrest her. This requires the Court to determine whether the facts and circumstances within Perry's knowledge would warrant a person of reasonable caution to believe Defendant was committing a crime. Probable cause is an objective standard.

The evidence in the record shows that before he arrested Defendant, Perry could see that she had unnatural-looking bulges on her sides near her waist underneath her clothing. This is borne out by the photographs taken at the station after her arrest. Defendant testified that she had five (not four) large bottles tucked into a girdle worn under her pants, and that when Perry took the photographs of her he had partially untucked those bottles so that the tops of them were no longer contained in her girdle. Even assuming for the sake of argument that is true, given the size and number of the bottles in question it is impossible to believe that they would not have caused visible bulges under her clothing even if they were under her girdle.

Second, even though the bulges were visible, when Perry asked her about it Defendant denied that she had anything under her shirt. The fact that Defendant would deny the existence of

something so apparent was suspicious. Third, in Perry's training and considerable experience doing drug interdiction work on trains and busses, he knew that it is a common technique for drug traffickers to conceal illegal narcotics under their clothing and close to their body. Finally, during the pat down Perry could feel that the bulges under her clothing were not part of Defendant's body but rather hard bundles. This again was consistent with the type of hard bundles that Perry had found concealed under the clothing of other drug traffickers. Taken together, these facts support probable cause for Perry to believe that Defendant was committing the crime of drug trafficking.

This case is distinguishable from *United States v. Cooper*, 103 F. Supp. 3d 1286 (D.N.M. 2015) (Vazquez, J.), upon which Defendant relies. In *Cooper*, Agent Perry was performing drug interdiction duties on a Greyhound bus stopped in Albuquerque. Perry was suspicious of the female defendant who was traveling under a ticket issued to someone with a different name, "Joe Wheeler." She also denied association with a male passenger traveling under a ticket issued to "Wanda Wheeler." Although it was clear that neither was traveling under their own name, Perry did not investigate this curious circumstance further. In *Cooper*, Perry asserted that he observed bundles around the defendant's waist, but when he asked her about them, she claimed it was her own stomach and a colostomy bag and declined permission for a pat down. Perry arrested the defendant anyway. The *Cooper* court concluded that while it was "an extremely close case," the arrest lacked probable cause, explaining its decision as follows:

> Special Agent Perry confronted a couple who had demonstrably lied about traveling eastbound together, carrying tickets issued in names other than their own, one of whom appeared to have a slightly paunchy stomach, for which she gave a plausible explanation. Given the fact that Special Agent Perry made no effort to investigate the purportedly suspicious tickets and the indeterminate appearance of Cooper's stomach, the Court cannot find that Special Agent Perry had probable cause to arrest Cooper.

*Id.* at 1295.

The circumstances in *Cooper* differ from this case in two important respects. The first is that in this case, the photographic evidence shows that Perry *could* see large, unnatural-looking bulges under the clothing around Defendant's waist area. Thus, when he asked Defendant about them and she said there was nothing there, he had good reason to believe she was lying. *See United States v. Moore*, 22 F.3d 241, 244 n. 4 (10th Cir. 1994) ("[L]ying to an officer is not consistent with innocent travel."). Second, this case is different from *Cooper* in that the Defendant granted permission for a pat down, which enabled Perry to feel the bundles. From this, he could determine that they were not a colostomy bag, or fatty tissue, but rather hard bundles consistent—in his extensive experience—with drug packaging.

Defendant's reliance on *United States v. Garcia-Guzman*, 432 F. Supp. 3d 1324 (D.N.M. 2020) is also unavailing. The issues in that case were whether the encounter was consensual, whether the defendant gave valid consent to a search, whether Perry exceeded the scope of consent, and whether consent was withdrawn. That opinion contains no discussion of whether and to what extent the presence of bulges under a suspects clothing may contribute to a finding of probable cause.

Thus, the Court concludes that a person of reasonable caution in Agent Perry's shoes had reason to believe that Defendant was committing a crime. In light of the foregoing, the Court concludes there is no basis upon which to suppress the evidence against Defendant, and the motion should be denied.

26

**IT IS THEREFORE ORDERED** that the Defendant's *Motion for Order Granting Specific Performance and Enforcement of Plea Resolution* [Doc. 59] is **DENIED**, and the Defendant's *Motion to Suppress Evidence* [Doc. 65] is **DENIED**.

_____

**UNITED STATES DISTRICT JUDGE**